**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

CRAIG T. GOLDBLATT  
JUDGE

824 N. MARKET STREET  
WILMINGTON, DELAWARE  
(302) 252-3832



February 7, 2023

**VIA CM/ECF**

    Re:    *Drivetrain, LLC v. X.Commerce, Inc.*, Adv. Proc. No. 22-50448

Dear Counsel:

    This lawsuit seeks to avoid and recover approximately $840,000 in transfers that the debtor made to the defendant prior to its bankruptcy. The complaint asserts that the transfers are voidable on the grounds that they were actual fraudulent conveyances, constructive fraudulent conveyances, and/or preferences. The defendant has moved to dismiss the complaint for failure to state a claim under Civil Rule 12(b)(6) as made applicable hereto by Bankruptcy Rule 7012(b). For the reasons set forth below, the motion will be denied with respect to the claims for actual and constructive fraudulent conveyance but granted with respect to the preference claims.

**Factual and Procedural Background**

    The debtor was (or at least purported to be) a cyberfraud prevention company.[1] The complaint alleges, however, that the debtor's business was fundamentally fraudulent. Specifically, the complaint alleges that the debtor's founder, Adam Rogas, provided potential investors with false reports of its customers and revenue

---

[1] D.I. 1 ¶ 13. The debtor in this bankruptcy case, now known as Cyber Litigation, Inc., was previously known as NS8 Inc. *Id.* ¶¶ 5-6. The facts set forth herein are taken from the allegations in the complaint, D.I. 1, which are taken as true for purposes of this motion. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (on motion to dismiss for failure to state a claim, trial court is to take well-pleaded facts as true).

Case 22-50448-CTG    Doc 28    Filed 02/07/23    Page 2 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 2 of 13

in order to raise funds.[2]  The plaintiff, Drivetrain LLC, is the acting trustee of the Cyber Litigation Trust created by the debtor's plan of liquidation.[3]

Defendant Magento Inc. is a "platform partner" – a company "that sell[s], market[s], and advertise[s] software and other goods and services on web-based or app-based platforms."[4]  In 2018, Rogas caused the debtor to enter into the first partnership contract with Magento.  Under this contract, the debtor became a "select partner" of Magento, entitling it to certain marketing and consultant services in exchange for payments calculated by the debtor's reported revenue.[5]  In 2019, the debtor entered into a second agreement with Magento, the "Premier Agreement."[6]  As a premier-level partner, the debtor received additional marketing and sales services, but was also required to make higher payments.

The complaint alleges that neither the select nor premier partnership agreement provided the debtor with any benefit.  Rather, "Rogas and his associates caused Debtor to engage with several platform partners to create a façade that Debtor was running a successful business."[7]  The alleged scheme played out as follows: Rogas would cause the debtor to enter into various partnership agreements with several platform partners, including Magento.  Magento calculated its fees based on revenue reports submitted by the debtor detailing how much revenue was earned using Magento's services.  Rogas would falsify these revenue reports to give the appearance of a profitable company, even claiming at one point that the debtor earned $26.5 million in revenue from customers obtained through Magento.[8]  Rogas would then use those same revenue reports as "proof" that the debtor was a successful business to attract additional investors.  In short, these partnership contracts were "critical component[s] of Rogas' fraudulent scheme."[9]

In order to perpetuate this scheme, however, the debtor needed to meet its obligations under the contracts.  Under the first partnership agreement, the debtor

---

[2] D.I. 1. ¶¶ 13, 20-29.

[3] *Id.* ¶ 9.  Drivetrain LLC is referred to as the "trustee."

[4] *Id.* ¶ 36.  Defendant is currently named X.Commerce, Inc.  The caption to the complaint states that this entity does business as Adobe Commerce and was formerly known as Magento, Inc.  Because the factual allegations of the complaint refer to the defendant as the Magento, the name under which it is alleged the defendant then conducted business, the defendant is referred to herein as "Magento."

[5] *Id.* ¶¶ 41-44.

[6] *Id.* ¶ 51.

[7] *Id.* ¶ 37.

[8] *Id.* ¶ 88.

[9] *Id.* ¶ 40.

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 3 of 13

made two $45,000 payments to Magento between 2018 and 2019.[10] Under the second, premier-level contract, the debtor was required to pay a yearly commission, referred to as a "revenue share," equal to 25 percent of all revenue earned on sales made on Magento's platform. This commission was calculated on a yearly basis, but the debtor was obligated to make several interim "prepayments" that would later be offset against the 25 percent commission as part of a year-end true up.[11] Under the agreements, the debtor was required to pay $500,000 in prepayments the first year prior to the true up, $1 million the second year, and $1.5 million the third.[12] The complaint alleges that the debtor made quarterly payments of $125,000 in July 2019, October 2019, January 2020 and April 2020. The complaint further alleges that the debtor made a quarterly payment of $250,000 in July 2020.[13] At no time did Magento request a true up or even submit an invoice for the 25 percent commission.

The trustee now seeks to recover the $840,000 in transfers made to Magento under applicable fraudulent conveyance and preference law. *First,* the trustee alleges that the debtor's payments to Magento were made with actual intent to hinder, delay, or defraud its creditors by allowing the debtor to perpetuate the fraudulent scheme detailed above. For example, the complaint alleges that the debtor's chief revenue officer used the debtor's "purported growth with [Magento] to back up Debtor's false claims of significant revenue growth" and secure capital from investors "who relied upon these results to make additional multi-million dollar investments in [the] Debtor."[14]

*Second*, the trustee alleges that these payments are voidable as constructive fraudulent transfers because the debtor was insolvent at the time of each transfer and received no value on account of such transfers. According to the complaint, from "its inception through the Petition Date, Debtor's expenses exceeded $13 million," but the "debtor never generated more than $200,000 of revenue in a year – and in most years it earned substantially less than that."[15] The debtor's insolvency, the trustee contends, is therefore evident, especially since any additional investments were secured through fraud, thus "transforming these investors into creditors that Debtor knew it would never have the ability to repay."[16] On account of the debtor's perpetual insolvency, it is alleged that the debtor was incapable of receiving *any* value from the

---

[10] *Id.* ¶ 46.

[11] *Id.* ¶¶ 65-67.

[12] *Id.* ¶ 68.

[13] *Id.* ¶ 71.

[14] *Id.* ¶¶ 102-103.

[15] *Id.* ¶¶ 17-18.

[16] *Id.* ¶ 106.

Case 22-50448-CTG    Doc 28    Filed 02/07/23    Page 4 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 4 of 13

partnership contracts. As the complaint notes, these contracts were designed for "very large companies, who could pay Magento significant amounts for additional assistance with marketing on Magento's platform," not for companies "that had far less revenue than a million dollar a year."[17] Because the debtor did not fit that profile, the trustee maintains that "those services had no value to debtor."[18]

*Third*, the trustee seeks to recover the $250,000 paid to Magento in July of 2020 as a preference.[19]

Defendant moved to dismiss each of the trustee's counts.[20] The Court heard oral arguments on the matter on January 25, 2023.

## Jurisdiction

The district court has jurisdiction over this action under 28 U.S.C. § 1334(b), as the claims asserted herein "arise under" the Bankruptcy Code. The proceeding has been referred to this Court under 28 U.S.C. § 157(a) and the district court's standing order of reference.[21] In view of the Court's disposition of the motion, the Court does not believe it is necessary or appropriate to address the question of whether the underlying claims are "core" or "non-core."

## Analysis

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Meeting this standard, the Supreme Court has held, "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." It requires a showing that the claim is "plausible on its face."[22] Plausibility "requires more than a sheer possibility that a defendant acted unlawfully but is not akin to the probability

---

[17] *Id.* ¶¶ 53, 57.

[18] *Id.* ¶ 100.

[19] *Id.* ¶¶ 145-153.

[20] D.I. 5.

[21] Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated Feb. 29, 2012.

[22] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation omitted).

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 5 of 13

standard. Rather, a plaintiff must allege sufficient facts to nudge the claims across the line from conceivable to plausible."[23]

A complaint that fails to meet this plausibility standard is subject to dismissal under Federal Rule of Civil Procedure 12(b)(6). The Third Circuit has explained that a court reviewing the plausibility of a complaint must engage in a three-step analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.[24]

Additionally, a court should draw all reasonable inferences from the well-pleaded facts in favor of the non-moving party.[25]

## I. The trustee has adequately pled its count for actual fraudulent conveyance.

11 U.S.C. § 548(a)(1)(A) authorizes the trustee to avoid any transfer "of an interest of the debtor in property" if such transfer was made "with actual intent to hinder, delay, or defraud" a creditor. Proving actual intent, however, is difficult at times, since those who intend to defraud others rarely make public announcements of their intentions. Courts therefore commonly rely on circumstantial evidence, or "badges of fraud," from which a defendant's fraudulent intent can be inferred. Neither the presence nor absence of any particular badge is dispositive. Rather, these "badges" operate essentially as clues from which a defendant's intent might be gleaned.[26]

Defendant's principal argument for dismissal is that the complaint "is devoid of factual allegations that would support the presence of 'badges of fraud' from which actual intent may be inferred."[27] At the January 25 hearing, defendant argued that of the several badges of fraud recognized by case law, the complaint alleges only two

---

[23] *Superior Silica Sands LLC v. Iron Mountain Trap Rock Co.*, No. 20-51052 (KBO), 2021 Bankr. LEXIS 2361 at *7 (Bankr. D. Del. Aug. 26, 2021) (internal quotation omitted).

[24] *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citations omitted).

[25] *Bohus v. Restaurant.com, Inc.*, 784 F.3d 918, 921 n.1 (3d Cir. 2015).

[26] *In re OODC, LLC*, 321 B.R. 128, 140 (Bankr D. Del. 2005).

[27] D.I. 6 at 7.

Case 22-50448-CTG    Doc 28    Filed 02/07/23    Page 6 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 6 of 13

– that the debtor was insolvent at the time of the transfers and that the debtor received less than reasonably equivalent value on account of those transfers.[28]

This argument, however, confuses the forest for the trees. Badges of fraud operate as a "substitute for direct evidence."[29] As such, they are essentially beside the point when the plaintiff makes specific factual allegations, in a non-conclusory fashion, of a defendant's actual intent to defraud its creditors. In other words, badges are helpful when a court is left to draw an inference about the defendant's intent in the absence of direct evidence, but they "need not be alleged in a case in which a complaint adequately alleges facts that would support a direct inference that a transfer was made with the actual intent to hinder, delay, or defraud creditors."[30]

Here, even applying the heightened pleading standard for allegations of fraud,[31] the trustee has sufficiently pled that the Magento payments were made with the actual intent to defraud creditors. Taking all well-pleaded facts as true, the complaint fairly alleges that the debtor entered into these contracts as part of an elaborate head fake. The goal was to trick investors into believing that the company was both successful enough to afford Magento's services and was generating significant revenue from those services. The contracts, therefore, served no other purpose but "to allow Rogas and his associates to perpetuate fraud on Debtor's investors and Board."[32] Those are sufficient allegations of an actual intent to defraud.

The fact that the allegations of the complaint do not contain many of the usual "badges of fraud" is perhaps unsurprising in this case, in that this case differs from the paradigmatic fraudulent conveyance action around which those "badges" were designed. The badges of fraud developed in the caselaw are designed to smoke out the circumstances in which a transaction that may on its face appear innocuous or legitimate is in fact an effort by a debtor to put its assets outside the reach of creditors. In this case, however, the allegation is not that the debtor was moving its assets into friendly hands where the creditors cannot reach them. It is instead that the transaction was part of an elaborate ruse that played a critical role in the debtor's larger fraudulent scheme. Because of the difference between this action and what might be viewed as the paradigmatic fraudulent conveyance action, it is not surprising that the allegations of the complaint to do not involve many of the typical badges of fraud.

---

[28] Jan. 25, 2023 Hr'g Tr. at 13.

[29] *In re Millennium Lab Holdings II, LLC*, 2019 Bankr. LEXIS 636 at *9 (Bankr. D. Del. 2019).

[30] *In re MTE Holdings, LLC*, No. 19-12269 (CTG), 2022 Bankr. LEXIS 2352 at *8 (Bankr. D. Del. 2022).

[31] Fed. R. Civ. P. 9(b).

[32] D.I. 1 ¶ 101.

Case 22-50448-CTG   Doc 28   Filed 02/07/23   Page 7 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 7 of 13

But that hardly means that the allegations of the complaint do not allege the kind of transaction that is covered by the fraudulent conveyance statute. Section 548 of the Bankruptcy Code allows the avoidance of any transfer if it was done "with actual intent to hinder, delay, *or defraud*" a creditor.[33] It may be true that the debtor who transfers funds to their neighbor in an attempt to appear judgment-proof is guilty of hindering or delaying creditor recovery.[34] But it is equally true, as a matter of ordinary English, that the scheme alleged in the complaint is one in which the debtor sought to defraud its creditors. And because § 548 is "set out in the disjunctive, 'a showing of any one of the three requisites state of mind – the intent to hinder, the intent to delay, or the intent to defraud – is sufficient to establish the intent element.'"[35] The complaint sufficiently alleges actual intent to defraud creditors to survive a motion to dismiss.[36]

## II. The trustee has adequately pled its count for constructive fraudulent conveyance.

A transfer may also be avoided under § 548(a)(1)(B), which provides for the avoidance of "constructive" fraudulent conveyances, if the transfer was made for less than reasonably equivalent value and the debtor was insolvent at the time of the transfer. Defendant argues that the complaint fails to allege either.

### A. Reasonably equivalent value

The term "reasonably equivalent value" is not defined by the Bankruptcy Code. The Third Circuit, however, set forth a two-part test in *In re R.M.L.* to determine whether a debtor received reasonably equivalent value: First, the court must consider whether the debtor received *any* value at all. If so, the question becomes whether the

---

[33] 11 U.S.C. § 548(a)(1)(A) (emphasis added).

[34] *Husky Int. Electronics, Inc. v. Ritz*, 136 S.Ct. 1581, 1587 (noting that "[i]n such cases, the fraudulent conduct. . . is in the acts of concealment and hindrance.").

[35] *In re Syntax-Brillian Corp.*, No. 08-11407 (BLS), 2016 Bankr. LEXIS 988, at *12 (Bankr. D. Del. 2016) (citing *In re Stanton*, 457 B.R. 80, 93 (Bankr. D. Nev. 2011)).

[36] There was, in the briefings and at the January 2023 hearing, some discussion of the applicability of the Ponzi scheme presumption. Where a Ponzi scheme exists, it is presumed that all transfers done in furtherance of that scheme are carried out with actual intent to hinder, delay, or defraud creditors. *In re DBSI*, No. 08-12687 (PJW), 2011 Bankr. LEXIS 1677, at * 10 (Bankr. D. Del. 2011). The parties disputed both whether the debtor's operations could be characterized as a Ponzi scheme and, if so, whether the payments made under the Magento contracts were made in furtherance of the alleged Ponzi scheme. Jan. 25, 2023 Hr'g Tr. at 19. Because the Court finds that actual intent exists under § 548(a)(1)(A), it need not address the applicability (or not) of Ponzi scheme presumption.

Case 22-50448-CTG    Doc 28    Filed 02/07/23    Page 8 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 8 of 13

debtor received roughly the same as what it gave.[37] These two inquiries, the Third Circuit explained, should be kept separate.[38]

The question of whether a debtor received any value at all is easily answered when the transferee confers a tangible benefit onto the debtor. For example, "there is no doubt that [a] debtor is receiving something of 'value'" when they receive the proceeds generated from a mortgage foreclosure sale – even if those proceeds are below fair market value – because the cash received is a tangible, measurable benefit.[39] When the debtor receives intangible benefits, "such as services or the opportunity to obtain economic value in the future," the analysis is less straightforward because these services or opportunities may never materialize into cognizable value.[40] In these cases, courts must analyze each transaction at the moment they were executed and ask whether, at that time, "the transaction conferred realizable commercial value" onto the debtor, or the expectation of such value that was both "legitimate and reasonable."[41]

Once a court finds that value was conferred, it may then consider whether such value was proportional to what the debtor gave up. Here, courts use a totality of the circumstances approach taking into account, "(1) the 'fair market value' of the benefit received as a result of the transfer, (2) 'the existence of an arm's-length relationship between debtor and the transferee,' and (3) the transferee's good faith."[42]

Applying these principles, the Court is satisfied that, at least for the purposes of considering a motion to dismiss, the trustee has sufficiently pled that the debtor received no value from these partnership agreements. In fairness, the complaint acknowledges that the debtor ultimately received $6,800 in revenue and acquired nine new customers from Magento's services.[43] From this, defendant would have the Court conclude that the debtor received at least some value from the partnership contracts sufficient to satisfy the first part of the *R.M.L.* test.[44] The Court, however,

---

[37] 92 F.3d 139, 149 (3d Cir. 1996).

[38] *Id*.

[39] *Id*. *See also BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994).

[40] *In re R.M.L.*, 92 F.3d at 149.

[41] *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991); *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 212 (3d Cir. 2006) ("A court must consider whether, based on the circumstances that existed at the time of the transfer, it was legitimate and reasonable to expect some value accruing to the debtor.") (citations omitted)).

[42] *In re Fruehauf Trailer Corp.*, 444 F.3d at 213.

[43] D.I. 1 ¶¶ 87-88.

[44] D.I. 6 at 12.

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 9 of 13

is bound to follow the Third Circuit's command and limit its analysis to the "circumstances that existed at the time of the transfer," not when value eventually reached the debtor.[45]

At the time the debtor incurred these obligations, it had never earned more than $200,000 of revenue in a year,[46] while generating close to $13 million in expenses throughout its existence.[47]  By contrast, it is alleged that these partnership contracts were "designed for very large companies, who could pay Magento significant amounts for additional assistance with marketing on Magento's platform."[48]  Indeed, one of the defendant's representatives testified that "he 'would probably not entertain a company that had far less revenue than a million dollar a year for [a premier] level relationship.'"[49]  The punchline is that the debtor could not have received any *realizable* commercial value from these contracts because "it was a service that was intended solely to allow large companies to grow. . . because the debtor was not a large company it did not take advantage of any of the services offered to a premier member, nor could (or did) it benefit from them."[50]  Similarly, any expectation of value would have not been reasonable or legitimate because the debtor, through Rogas, knew that it was only entering into these agreements to perpetuate its fraudulent scheme.  Accordingly, drawing all reasonable inferences in favor of the non-moving party (as applicable law requires), the Court is satisfied that the lack of reasonably equivalent value is adequately alleged.

   B.   **Insolvency**

A complaint asserting a claim for constructive fraudulent conveyance must also allege that the debtor was either insolvent at the time of the transfer or became insolvent as a result of the transfer.[51]  The Bankruptcy Code defines an "insolvent" entity as one for which the sum of its "debts is greater than all of such entity's property, at fair valuation."[52]  The trustee also invokes Delaware fraudulent conveyance law (in connection with a claim asserted under the trustee's strong-arm powers set forth in § 544(b) of the Bankruptcy Code), under which a debtor is considered insolvent if it engaged in a transaction whereby the debtor undertook

---

[45] *In re Fruehauf Trailer Corp.*, 444 F.3d at 212 (internal quotation omitted).

[46] D.I. 1 ¶ 18.

[47] *Id.* ¶ 17.

[48] *Id.* ¶ 53.

[49] *Id.* ¶ 57.

[50] *Id.* ¶¶ 96, 98.

[51] 11 U.S.C. § 548(a)(1)(B)(ii)(I).

[52] 11 U.S.C. § 101(32)(A).

Case 22-50448-CTG    Doc 28    Filed 02/07/23    Page 10 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 10 of 13

liabilities unreasonably disproportional to the value received, or the debtor knew (or should have known) that it would be unable to service the debts resulting from such a transaction.[53] The standard set forth in the Bankruptcy Code is commonly referred to as the "balance sheet test," and the two state law tests are known as the "inadequate capital" and "cash flow" tests.[54]

The complaint pleads facts sufficient to satisfy the balance sheet test and the inadequate capital test. Paragraphs 17 through 19, for example, allege that while the debtor generated more than $13 million in expenses from its inception in 2016 through the petition date, it never had more than $200,000 in yearly revenue, and its "total revenue for its total existence was less than $500,000."[55] The inference, of course, is that the debtor's liabilities continually outstripped its assets, leaving it in a state of perpetual insolvency. As the complaint alleges, "[d]ebtor's minimal sales revenue was insufficient to meet its significant operating expenses and liabilities, including many millions of dollars paid to its employees, rendering Debtor insolvent for virtually the entirety of its existence."[56]

Magento contends that the trustee is excluding an important factor from its insolvency calculations – investor funds. Even if, Magento argues, the debtor's liabilities totaled more than $13 million, the complaint acknowledges that the debtor obtained investments exceeding $60 million. Indeed, Magento points out, the debtor had sufficient cash on hand to pay $72 million in June 2020 in connection with a tender offer.[57] According to Magento, if one takes account of the funds that Rogas was able to secure from outside investors, the debtor clearly had assets in excess of its operating expenses.

The problem with this argument, however, is that the complaint alleges that these investments were procured by virtue of the same fraudulent representations that drove the debtor into bankruptcy. When an investor is fraudulently induced into making an investment based on a company's material misrepresentations, the investor immediately becomes a creditor – holding a tort claim against the company for having been defrauded into making those investments.[58] These claims, even if

---

[53] 6 *Del. C.* § 1304(a)(2).

[54] *In re Opus East, LLC*, 528 B.R. 30, 50-51 (Bankr. D. Del. 2015).

[55] D.I. 1 ¶¶ 17-19.

[56] *Id.* ¶ 20.

[57] D.I. 6 at 14, *see also* D.I. 1 ¶¶ 111, 113.

[58] *See Kach v. Hose*, 589 F.3d 626, 634-635 (3d Cir. 2009) ("As a general matter, a cause of action accrues at the time of the last event necessary to complete the tort, usually at the time the plaintiff suffers an injury. The cause of action accrues even though the full extent of the injury is not then

Case 22-50448-CTG    Doc 28    Filed 02/07/23    Page 11 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 11 of 13

contingent or unliquidated, are nevertheless "debt" that is properly considered when determining insolvency.[59]

The complaint makes the same point, stating that "[d]ebtor also was insolvent because it induced investors' capital contributions through fraud, transforming these investors into creditors that Debtor knew it would never have the ability to repay."[60] With respect to the tender offer, the complaint alleges that the debtor fraudulently "convinced outside investors to invest in excess of $60,000,000 in Debtor," which the debtor then used to pay off "earlier investors and employees, and that because Debtor's revenues and customers were fake, [the debtor knew] that the investors would almost certainly lose all of their investments."[61] Accordingly, the complaint sufficiently alleges the debtor's insolvency for purposes of this motion to dismiss.

### III. The trustee has failed to plead a claim for preference because the alleged preferential transfers were not alleged to have been made on account of an antecedent debt.

Section 547 authorizes the trustee to recover any preferential payments made within 90 days before the bankruptcy filing. In this case, the $250,000 payment the debtor allegedly made to Magento in July 2020 fell within the 90-day preference period. In order for a transfer to be considered a preference, it must have been made "on account of an antecedent debt owed by the debtor."[62] For purposes of § 547(b), a debt is antecedent only if "it was incurred before the debtor made the allegedly preferential transfer."[63]

Defendant moves to dismiss on the ground that the July payment was not made on account of an antecedent debt. Specifically, defendant contends that all payments made under the Premier Agreement – which includes the $250,000 transfer at issue here – were prepayments made in advance of the yearly 25 percent revenue share obligation.[64] The complaint acknowledges that all of the payments the debtor

---

known or predictable.") (citations omitted). Nothing herein, however, should be construed to address the question whether such a claim may be subject to subordination under 11 U.S.C. § 510(b).

[59] *In re Bayou Group, LLC*, 439 B.R. 284, 335 (S.D.N.Y. 2010) (holding that equity holder's claims for fraudulent misrepresentation made at the time of the initial investment were properly considered in an insolvency analysis); *In re TWA*, 134 F.3d 188, 197-198 (3d Cir. 1998) (holding that contingent liabilities could be considered in an insolvency analysis).

[60] D.I. 1 ¶ 106.

[61] *Id*. ¶¶ 111-112.

[62] 11 U.S.C. § 547(b)(2).

[63] *In re Vaso Active Pharms. Inc.*, 500 B.R. 384, 393 (Bankr. D. Del. 2013).

[64] D.I. 6 at 15-16.

Case 22-50448-CTG   Doc 28   Filed 02/07/23   Page 12 of 13

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 12 of 13

made were defined as "prepaid revenue shares" by the agreement and would later be offset against the final amount owed.[65]

As Judge Walsh explained, "it is well established that advance payments are *prima facie* not preferences because the transfer from the debtor to the creditor is not for or on account of an antecedent debt."[66] The rationale is that a prepayment is a payment made before the debtor incurs an obligation to pay – that is, these payments are made in anticipation of goods being delivered or services being provided. Unless and until such goods and services are received, no obligation to pay exists.

The trustee responds that the "prepayments" here are not subject to this principle because the debtor was contractually obligated to make them under the Premier Agreement. Because the agreement created such a legal obligation, the trustee argues, the making of the payment satisfied that obligation. Accordingly, the trustee continues, the payment was made on account of an antecedent debt.[67]

The district court in *In re NewPage Corp.*, however, squarely rejected this argument. That court explained that the "entry into an agreement that requires prepayment does not alone create an antecedent debt or change the result that a prepayment is by definition not on account of an antecedent debt."[68] The Court thus finds that the $250,000 payment made to Magento is properly classified as a prepayment. Under the reasoning of *New Page*, the debtor's contractual obligation to make this prepayment is of no consequence. Because prepayments are (by definition) not made on account of an antecedent debt, the trustee has failed to allege facts sufficient to plead a claim for preference. Defendant's motion to dismiss this claim will thus be granted without prejudice.

---

[65] D.I. 1 ¶ 66.

[66] *In re Hechinger Inv. Co. of Del., Inc.*, No. 99-02261 (PJW), 2004 Bankr. LEXIS 2156, *8-9 (Bankr. D. Del. 2004).

[67] Jan. 25, 2023 Hr'g Tr. at 60.

[68] 569 B.R. 593, 602-603 (D. Del. 2017).

*Drivetrain, LLC v. X. Commerce, Inc.*, Adv. Proc. No. 22-50448
February 7, 2023
Page 13 of 13

## Conclusion

    For the reasons set forth above, the defendant's motion to dismiss the fraudulent conveyance counts will be denied. Defendant's motion to dismiss the preference claim will be granted. The parties are directed to settle an appropriate order under certification of counsel.

                                                  Sincerely,

                                                  Craig T. Goldblatt
                                                  United States Bankruptcy Judge